**In re UNION CARBIDE CORPORATION GAS PLANT DISASTER AT BHOPAL, INDIA IN DECEMBER, 1984.**

Misc. No. 21–38 (JFK).

United States District Court,
S.D. New York.

May 12, 1986.

As Amended June 10, 1986.

Robins, Zelle, Larson & Kaplan, Minneapolis, Michael V. Ciresi, Bruce A. Finzen, Roberta B. Walburn, D.S. Sastri of counsel. Barrett, Smith, Schapiro, Simon & Armstrong, New York City, Gerald A. Novack, of counsel, for the Union of India.

Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, Ohio, Stanley M. Chesley, Phillip B. Allen, Jan Levien, of counsel, Bailey & Broder, New York City, F. Lee Bailey, Michael C. Zwal, of counsel, for individual plaintiffs.

Hoffinger, Friedland, Dobrish, Bernfeld & Hasen, New York City, Jack S. Hoffinger, of counsel, Liaison Counsel.

Kelley Drye & Warren, New York City, Bud G. Holman, William A. Krohley, Lisa E. Cleary, of counsel, for defendant.

Christic Institute, Washington, D.C., Rob Hager, Shelley D. Hayes, of counsel, for Amicus Curiae.

## OPINION and ORDER

KEENAN, District Judge:

### FACTUAL BACKGROUND

On the night of December 2-3, 1984 the most tragic industrial disaster in history occurred in the city of Bhopal, state of Madhya Pradesh, Union of India. Located there was a chemical plant owned and operated by Union Carbide India Limited ("UCIL"). The plant, situated in the northern sector of the city, had numerous hutments adjacent to it on its southern side which were occupied by impoverished squatters. UCIL manufactured the pesticides Sevin and Temik at the Bhopal plant at the request of, and with the approval of, the Government of India. (Affidavit of John MacDonald ("MacDonald Aff.") at 2). UCIL was incorporated under Indian law in 1934. 50.9% of its stock is owned by the defendant, Union Carbide Corporation, a New York corporation. (MacDonald Aff. at 1). Methyl isocyanate (MIC), a highly toxic gas, is an ingredient in the production of both Sevin and Temik. On the night of the tragedy MIC leaked from the plant in substantial quantities for reasons not yet determined.

The prevailing winds on the early morning of December 3, 1984 were from Northwest to Southeast. They blew the deadly gas into the overpopulated hutments adjacent to the plant and into the most densely occupied parts of the city. The results were horrendous. Estimates of deaths directly attributable to the leak range as high as 2,100. No one is sure exactly how many perished. Over 200,000 people suffered injuries—some serious and permanent—some mild and temporary. Livestock were killed and crops damaged. Businesses were interrupted.

On December 7, 1984 the first lawsuit was filed by American lawyers in the United States on behalf of thousands of Indians. *Dawani et al. v. Union Carbide Corp.*, S.D.W.Va. (84–2479). Since then 144 additional actions have been commenced in federal courts in the United States. The actions have all been joined and assigned by the Judicial Panel on Multidistrict Litigation to the Southern District of New York by order of February 6, 1985, 601 F.Supp. 1035.

The individual federal court complaints have been superseded by a consolidated complaint filed on June 28, 1985.

The Indian Government on March 29, 1985 enacted legislation, the Bhopal Gas Leak Disaster (Processing of Claims) Act (21 of 1985) ("Bhopal Act"), providing that the Government of India has the exclusive right to represent Indian plaintiffs in India and elsewhere in connection with the tragedy. Pursuant to the Bhopal Act, the Union of India, on April 8, 1985, filed a complaint with this Court setting forth claims for relief similar to those in the consolidated complaint of June 28, 1985.

By order of April 25, 1985 this Court established a Plaintiffs' Executive Committee, comprised of F. Lee Bailey and Stanley M. Chesley, Esqs., who represented individual plaintiffs and Michael V. Ciresi, Esq., whose firm represents the Union of India. Jack S. Hoffinger, Esq., who represents individual plaintiffs, was appointed liaison counsel for the Plaintiffs' Executive Committee.[1]

On September 24, 1985, pursuant to the Bhopal Act, the Central Government of India framed a "scheme" for the Registration and Processing of Claims arising out of the disaster. According to the Union of India's

---

1. All counsel on the Plaintiffs' Executive Committee were most professional and helpful to the Court in this case. Mr. Hoffinger agreed to proceed *pro bono* in this case, and waived any possible fee. The Court has been informed that neither Mr. Hoffinger, nor anyone else on the Plaintiffs' Executive Committee, nor anyone in their law firms went to India on the days immediately following the tragedy to "sign up" Indian plaintiffs. The behavior of many American lawyers who went to Bhopal, India during December 1984 and January 1985 is not before this Court on this motion. Suffice it to say that those members of the American bar who travelled the 8,200 miles to Bhopal in those months did little to better the American image in the Third World—or anywhere else. None of them were on the Plaintiffs' Executive Committee.

counsel, over 487,000 claims have been filed in India pursuant to the "scheme."

There presently are 145 actions filed in the United States District Court for the Southern District of New York under the Judicial Panel for Multidistrict Litigation's order of February 6, 1985, involving approximately 200,000 plaintiffs.

Before this Court is a motion by the defendant Union Carbide Corporation ("Union Carbide") to dismiss the consolidated action on the grounds of *forum non conveniens*.

## DISCUSSION

■ The doctrine of *forum non conveniens* allows a court to decline jurisdiction, even when jurisdiction is authorized by a general venue statute. In support of its position that the consolidated action before the Court should be transferred to a more convenient forum within the Union of India pursuant to this doctrine, Union Carbide relies on the United States Supreme Court's decisions in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The plaintiffs cite numerous other lower United States federal court cases in their briefs and seek to distinguish the Supreme Court's decisions from this case. Of course, *Gilbert* and *Piper* are the touchstones in sorting out and examining the contentions of both sides to this motion on the various factors bearing on convenience.

*Piper* teaches a straightforward formulation of the doctrine of *forum non conveniens*. A district court is advised to determine first whether the proposed alternative forum is "adequate." This inquiry should proceed in the order followed below. Then, as a matter within its "sound discretion," *Piper* at 257, 102 S.Ct. at 266, the district court should consider relevant public and private interest factors, and reasonably balance those factors, in order to determine whether dismissal is favored. This Court will approach the various concerns in the same direct manner in which *Piper* and *Gilbert* set them out.

At this juncture, it would be appropriate to discuss the presumptions on a *forum non conveniens* motion. In *Piper*, the Court discussed its earlier finding in *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), which suggested that a plaintiff's choice of forum was entitled to great deference when the forum chosen was the home of the plaintiff. This presumption was based on the fact that the choice of the home forum indicated a reasonable assumption that the choice was convenient. *Koster* at 524, 67 S.Ct. at 831. Conversely, the *Piper* Court found:

> When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.

*Piper* 454 U.S. at 256, 102 S.Ct. at 266 (footnote omitted).

■ In the case now before the Court, in which the plaintiffs, including the Union of India, are foreign, and share a home forum which is not the instant forum, the assumption that this forum is convenient is not completely reasonable. The foreign plaintiffs' choice of the United States forum "deserves less deference" than would be accorded a United States citizen's choice. This Court will apply the presumption in favor of plaintiffs' choice of forum with "less than maximum force." *Piper* at 261, 102 S.Ct. at 268. *See* note 23 at 864, *infra*.

### 1. Preliminary Considerations.

"At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum." *Piper* at 254, n. 22, 102 S.Ct. at 265, n. 22. The elements of that inquiry are set forth in *Piper*. First, the Court said, "[o]rdinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Piper* at 254, n. 22,

102 S.Ct. at 265, n. 22, quoting *Gilbert* 330 U.S. at 506–507, 67 S.Ct. at 842. *Gilbert* states that the doctrine of *forum non conveniens* "presupposes at least two forums in which the defendant is amenable to process."

■ Extending the limited inquiry of *Gilbert*, the *Piper* Court delved into the relevance of the substantive and procedural differences in law which would be applied in the event a case was transferred on the grounds of *forum non conveniens*. The *Piper* Court determined that it was theoretically inconsistent with the underlying doctrine of *forum non conveniens*, as well as grossly impractical, to consider the impact of the putative transferee forum's law on the plaintiff in its decision on a *forum non conveniens* motion: "[I]f conclusive or substantial weight were given to the possibility of a change in law, the *forum non conveniens* doctrine would become virtually useless." *Piper* 454 U.S. at 250, 102 S.Ct. at 263.[2]

The Court listed numerous practical considerations which led to its conclusion that an unfavorable change in law for plaintiff was not a relevant factor in the forum analysis. First, the Court observed that if the chance of a change in law were given substantial weight, choice of law questions would "become extremely important." *Piper* at 251, 102 S.Ct. at 263. U.S. courts would "have to compare the rights, remedies, and procedures available" within the two proposed alternative forums, to determine whether a disadvantageous change in law would occur upon transfer. *Id.* Since "[t]he doctrine of *forum non conveniens*, however, is designed in part to help courts avoid conducting complex exercises in comparative law," the change in law analysis would subvert the doctrine itself. *Id.* Thus, a court engaged in the inquiry regarding the existence and adequacy of an alternative forum should not hinge its decision on an unfavorable change in law.[3]

Another practical concern relating to the "change in law" inquiry was discussed by the *Piper* court. Based on the liberality of United States federal law as compared to much foreign law with respect to availability of strict liability for tort, malleable and diverse choice of law rules among the 50 states, availability of jury trials, contingent fee arrangements and extensive discovery provisions, the Court observed that a change of forum might frequently involve an unfavorable change of law for foreign plaintiffs suing American defendants. *Piper* at 252, n. 18, 102 S.Ct. at 264, n. 18. Consequently, if the unfavorable change in law were a major factor in the analysis:

> [T]he American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts.

*Piper* at 252, 102 S.Ct. at 264 (footnotes omitted).

At the point, however, where the possible change in law would provide "no remedy at all" to plaintiff, a court may conclude that no adequate alternative exists. As the *Piper* Court observed, it did not hold that:

> [T]he possibility of an unfavorable change in law should *never* be a relevant consideration in a *forum non conveniens* inquiry. Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice.

*Piper* at 254, 102 S.Ct. at 265 (emphasis in original) (footnote omitted). Thus, while it

---

**2.** The Court found a theoretical flaw in the opposite rule, as set forth by the Third Circuit. Noting that a plaintiff would choose the forum with the most favorable choice of law rules in the first instance, "if the possibility of an unfavorable change in substantive law is given weight in the *forum non conveniens* inquiry, dismissal would rarely be proper." *Piper* at 250, 102 S.Ct. at 263.

**3.** Similarly, the Court determined that "the possibility of a change in law favorable to defendant should not be considered." *Piper* at 252, n. 19, 102 S.Ct. at 264, n. 19.

is not a "major factor" in the analysis, a court must at least consider the effect on plaintiffs of a change in law upon transfer.

To a great extent, the plaintiffs in this case argue that Indian courts do not offer an adequate forum for this litigation by virtue of the relative "procedural and discovery deficiencies [which] would thwart the victims' quest for" justice. (Memorandum in Opposition by Plaintiffs' Executive Committee ("Memo in Opp.") at 2). The defendant disputes this contention.

Plaintiffs' preliminary concern, regarding defendant's amenability to process in the alternative forum, is more than sufficiently met in the instant case. Union Carbide has unequivocally acknowledged that it is subject to the jurisdiction of the courts of India (Defendant's Memorandum in Reply filed December 20, 1985 ("Reply Memo") at 8); (oral argument January 3, 1986, transcript at 29, comment of Bud Holman, counsel for Union Carbide). Union Carbide is definitely amenable to process in India.

Beyond this initial test, plaintiffs and *amicus curiae*[4] argue that the Indian legal system is inadequate to handle the Bhopal litigation. In support of this position, plaintiffs have submitted the affidavit of Professor Marc S. Galanter of the University of Wisconsin Law School. Professor Galanter's credentials are impressive; he was a Fulbright Scholar at the Faculty of Law of Delhi University and specializes in South Asian Studies at the University of Wisconsin Law School. He is not, however, admitted to practice in India and the Court views his opinions concerning the Indian legal system, its judiciary and bar as far less persuasive than those of N.A. Palkhivala and J.B. Dadachanji, each of whom has been admitted to practice in India for over 40 years. Both are Senior Advocates before the Supreme Court of India. Mr. Palkhivala served as Indian Ambassador to the United States from 1977 to 1979, and has represented the Indian government on three occasions before international tribunals.

Although the outcome of this analysis, given the rule of *Piper* regarding change in law, seems self-evident, the Court will review plaintiffs' argument on the inadequacy of the Indian forum out of deference to the plaintiffs.

### A. Innovation in the Indian Judicial System.

Professor Galanter describes the Indian common law legal system, inherited from the British, in terms of its similarity to that of other common law systems. He compares the system favorably to that of the United States or Great Britain in terms of the appellate structure, the rule of *stare decisis*, the role of the judiciary as "guardian of [India's] democratic structure and protector of citizens' rights." (Galanter Aff., at 6–12) before pointing to its ostensible deficiencies. According to Professor Galanter, India's legal system "was imposed on it" during the period of colonial rule. (Galanter Aff. at 11). Galanter argues that "Indian legal institutions still reflect their colonial origins," (Galanter Aff. at 12), in terms of the lack of broad-based legislative activity, inaccessibility of legal information and legal services, burdensome court filing fees and limited innovativeness with reference to legal practice and education. (Galanter Aff. at 12).

On the question of innovativeness, Mr. Palkhivala responds with numerous examples of novel treatment of complex legal issues by the Indian Judiciary.[5] In the words of the former ambassador of India to the United States, "a legal system is not

---

4. Rob Hager, Esq. for Citizens Commission on Bhopal, National Council of Churches, United Church of Christ Commission for Racial Justice, *et al.*

5. For example, Mr. Palkhivala describes four cases in which the Indian Supreme Court crafted new and "courageous" remedies in situations relating to abridgements of fundamental rights.

(Palkhivala Aff. at 6–7). Mr. Dadachanji describes similar decisions in which he participated as an advocate, in his affidavit. (Dadachanji Aff. at 2–3). The Court recognizes the innovativeness of the Indian Courts, while refraining from an exhaustive survey of Indian case law.

a structure of fossils but is a living organism which grows through the judicial process and statutory enactments." (Palkhavala Aff. at 3). The examples cited by defendant's experts suggest a developed and independent judiciary. Plaintiffs present no evidence to bolster their contention that the Indian legal system has not sufficiently emerged from its colonial heritage to display the innovativeness which the Bhopal litigation would demand. Their claim in this regard is not compelling.

### B. Endemic Delays in the Indian Legal System.

Galanter discusses the problems of delay and backlog in Indian courts. Indeed, it appears that India has approximately one-tenth the number of judges, per citizen, as the United States,[6] and that postponements and high caseloads are widespread. Galanter urges that the backlog is a result of Indian procedural law, which allows for adjournments in mid-hearing, and for multiple interlocutory and final appeals. Numerous appeals and "[c]onsiderable delay [are] caused by the tendency of courts to avoid the decision of all the matters in issue in a suit, on the ground that the suit could be disposed of on a preliminary point." (Galanter Aff. at 17; 18–20, 21, quoting Indian Law Commission, 54th Report (1973) pp. 12–13).

This Court acknowledges that delays and backlog exist in Indian courts, but United States courts are subject to delays and backlog, too. *See* Remarks of Honorable Warren E. Burger, Chief Justice, Supreme Court of the United States, 100 F.R.D. 499, 534 (1983).

However, as Mr. Palkhivala states, while delays in the Indian legal system are a fact of judicial life in the proposed alternative forum, there is no reason to assume that the Bhopal litigation will be treated in ordinary fashion.

The Bhopal tragedy has already been approached with imagination in India. Demonstrating the creativity and flexibility of the Indian system, the Parliament of India has passed the Bhopal Act in order to deal with the cases arising from the sad events of December 3, 1984. The Bhopal Act permits the cases to be treated "speedily, effectively, equitably and to the best advantage of the claimants." (Palkhivala Aff. at 11).

Mr. Dadachanji refers to another Indian case which arose from a gas leak in New Delhi. The Chief Justice and another Justice of the Supreme Court of India ordered the presiding court to expedite adjudication of claims. *MC Mehta v. Union of India.* (Dadachanji Aff. at 11 and Annexure A thereto). In another instance, the Indian Supreme Court directed the High Court to hear a given matter on a daily basis, and set a deadline for delivering judgment (Dadachanji Aff. at 11 and Annexure B thereto). Other means of coping with delay are appointment of special tribunals by the Government of India (Dadachanji Aff. at 12 and Annexure C thereto), and assignment of daily hearing duties to a single special judge, otherwise unburdened, to hear a special matter. (Dadachanji Aff. at 11). This Court is persuaded, by the example of the Bhopal Act itself and other cases where special measures to expedite were taken by the Indian judiciary, that the most significant, urgent and extensive litigation ever to arise from a single event could be handled through special judicial accommodation in India, if required.

### C. Procedural and Practical Capacity of Indian Courts.

Plaintiffs contend that the Indian legal system lacks the wherewithal to allow it "to deal effectively and expeditiously" with the issues raised in this lawsuit. (Memo in Opp. p. 53).

Plaintiffs urge that Indian practitioners emphasize oral skills rather than written briefs. They allegedly lack specialization, practical investigative techniques and coordination into partnerships. These factors,

6. India allegedly has 10.5 judges per million population, as compared to 107 judges per million in the United States (Galanter Aff. at 15).

it is argued, limit the Indian bar's ability to handle the Bhopal litigation. As Mr. Dadachanji indicates, Indian lawyers have competently dealt with complex technology transfers, suggesting capability within the technological and scientific areas of legal practice, if not "specialization." (Dadachanji Aff. at 8). Moreover, Indian attorneys use experts, when necessary. As to investigative ability, Mr. Dadachanji persuasively points out that the Central Bureau of Investigation ("CBI") of the Union of India is well equipped to handle factual inquiry, as is the Commission of Enquiry constituted by the state of Madhya Pradesh. (Dadachanji Aff. at 8). While Indian attorneys may not customarily join into large law firms, and as Mr. Palkhivala states, are limited by present Indian law to partnerships of no more than twenty, this alone or even in concert with other factors does not establish the inadequacy of the Indian legal system. (Palkhivala Aff. at 8). There is no reason the Indian legislature could not provide for the expansion of law-firms, if such a choice is required. In any event, this Court is not convinced that the size of a law firm has that much to do with the quality of legal service provided. Many small firms in this country perform work at least on a par with the largest firms. Bigger is not necessarily better.

Moreover, since the Union of India purports to represent all the claimants, it is likely that if the case were transferred to India, the Attorney General or Solicitor General of India and the Advocate General of Madhya Pradesh, with attendant staffs, would represent the claimants. The Indian bar appears more than capable of shouldering the litigation if it should be transferred to India. (Palkhivala Aff. at 9).

Next, plaintiffs and Professor Galanter argue that the substantive tort law of India is not sufficiently developed to accommodate the Bhopal claims. Plaintiffs trace the lack of sophistication in Indian tort law to the presence of court fees for litigants as inhibiting the filing of civil suits. Though the filing fees may have had historical significance, they are irrelevant here. Professor Galanter acknowledges that court fees may be waived for "poor parties or for specific classes of litigants." (Galanter Aff. at 28). In fact, filing fees have been waived for claimants in India in the Bhopal litigation already begun there.

Professor Galanter asserts that India lacks codified tort law, has little reported case law in the tort field to serve as precedent, and has no tort law relating to disputes arising out of complex product or design liability. (Galanter Aff. at 30–36). As an illustration of the paucity of Indian tort law, Professor Galanter states that a search through the *All-India Reports* for the span from 1914 to 1965 revealed only 613 tort cases reported. (Galanter Aff. at 32). Mr. Dadachanji responds that tort law is sparsely reported in India due to frequent settlement of such cases, lack of appeal to higher courts, and the publication of tort cases in specialized journals other than the *All-India Reports*. (Dadachanji Aff. at 16–17; Palkhivala Aff. at 10). In addition, tort law has been codified in numerous Indian statutes. (Dadachanji Aff. at 16–17).

As Professor Galanter himself states, "the major categories of tort, their elements, the [theories] of liability, defenses, *respondeat superior*, the theories of damages—are all familiar." (Galanter Aff. at 37). What is different, Galanter asserts, is the complete absence of tort law relating to high technology or complex manufacturing processes. This is of no moment with respect to the adequacy of the Indian courts. With the groundwork of tort doctrine adopted from the common law and the precedential weight awarded British cases, as well as Indian ones, it is obvious that a well-developed base of tort doctrine exists to provide a guide to Indian courts presiding over the Bhopal litigation. In any event, much tort law applied in American cases involving complex technology has its source in legal principles first enunciated in Victorian England. *See, e.g., Rylands v. Fletcher*, 1868, L.R. 3 H.L. 330. As Mr. Palkhivala stated in his affidavit:

The plant itself was the product of highly complex technology, but complexity of the technology cannot be equated with complexity of legal issues. The principles of liability and damages involved in the Bhopal cases are all well established in India. The complexity is not in the nature or determination of legal issues but in the application of the law to the events which took place in Bhopal. Well settled law is to be applied to an unusual occurrence.

(Palkhivala Aff. at 7).

Plaintiffs next assert that India lacks certain procedural devices which are essential to the adjudication of complex cases, the absence of which prevent India from providing an adequate alternative forum. They urge that Indian pre-trial discovery is inadequate and that therefore India is an inadequate alternative forum. Professor Galanter states that the only forms of discovery available in India are written interrogatories, inspection of documents, and requests for admissions. Parties alone are subject to discovery. Third-party witnesses need not submit to discovery. Discovery may be directed to admissible evidence only, not material likely to lead to relevant or admissible material, as in the courts of the United States. Parties are not compelled to provide what will be actual proof at trial as part of discovery.

These limits on discovery are adopted from the British system. Similar discovery tools are used in Great Britain today. This Court finds that their application would perhaps, however, limit the victims' access to sources of proof. Therefore, pursuant to its equitable powers, the Court directs that the defendant consent to submit to the broad discovery afforded by the United States Federal Rules of Civil Procedure if or when an Indian court sits in judgment or presides over pretrial proceedings in the Bhopal litigation.[7] Any dismissal of the

action now before this Court is thus conditioned on defendant's consent to submit to discovery on the American model, even after transfer to another jurisdiction.

The ostensible lack of devices for third-party impleader or for organizing complex cases under the law of the state of Madhya Pradesh are two other procedural deficiencies which plaintiffs assert preclude a finding that India offers an adequate alternative forum. Assuming for the moment that, upon appropriate transfer, the Bhopal litigation would be adjudicated by the local district court in Bhopal, and that the law of Madhya Pradesh would be applied, this Court is still not moved by plaintiffs' argument regarding impleader or complex litigation.

Although no specific provision in the Indian Code of Civil Procedure permits the impleading of third-parties from whom contribution is sought, other provisions in the Code do provide for impleader. As both parties to this motion state, Order 1, Rule 10(2) of the Indian Code of Civil Procedure "allows the court to add additional parties if the presence of those parties is 'necessary in order to enable the Court effectively and completely to adjudicate upon and settle all questions involved in the suit.'" (Galanter Aff. at 60; Dadachanji Aff. at 18). Professor Galanter posits that a joint tortfeasor would not be considered a necessary party, and would not be joined. Defendant's expert, conversely, asserts that a party can be added to prevent multiplicity of suits and conflicts of decisions. Thus, Mr. Dadachanji argues, defendants would be able to seek contribution from third-parties if joinder would prevent repetitive litigation or inconsistency. Moreover, the broad provision of inherent powers to aid the ends of justice, as codified at Section 151 of the Indian Code of Civil Procedure would prevent an ultimate miscarriage of

---

7. A federal court has the power to condition transfer under the doctrine of *forum non conveniens* upon "the condition that defendant corporations agree to provide the records relevant to

the plaintiff's claims." *Piper* at 257, n. 25, 102 S.Ct. 267, n. 25. While the Court feels that it would be fair to bind the plaintiffs to American discovery rules, too, it has no authority to do so.

justice in the area of impleader. (Dadachanji Aff. at 19).[8]

The absence of procedures or mechanisms within the Indian judiciary to handle complex litigation is presented as support for plaintiffs' position regarding the nonexistence of an adequate alternative forum. Professor Galanter asserts, for example, that Indian judges do not promote settlements. The point is wholly irrelevant to the question of whether an adequate alternative forum exists. In any event, this Court has labored hard and long to promote settlement between the parties for over a year, to no avail. It would appear that settlement, although desirable for many reasons, including conservation of attorneys' fees and costs of litigation, preservation of judicial resources, and speed of resolution, is unlikely regardless of the level of activism of the presiding judge.

Plaintiffs' next contention is that since no class action procedure exists in India expeditious litigation of the Bhopal suits would be impossible. As with all of plaintiffs' other arguments, this purported deficiency does not constitute "no remedy" at all. Professor Galanter himself acknowledges that Order 1, Rule 8 of the Indian Code of Civil Procedure provides a mechanism for "representative" suits, "where there are numerous persons having the same interest in one suit." (Galanter Aff. at 54). Even if the current state of Indian law regarding "representative" suits involves application of the mechanism to preexisting groups such as religious sects or associations, there is no reason to conclude that the Indian legislature, capable of enacting the Bhopal Act, would not see its way to enacting a specific law for class actions. In addition, it does not appear on the face of Order 1, Rule 8 that the "representative" suit is expressly limited to preexisting groups. The Indian district court could adopt the rule for use in a newly

created class of injured, whose members all have "the same interest" in establishing the liability of the defendant. An Indian court has law available to create a representative class, or perhaps a few different representative classes. The "scheme" for registration and processing of claims, *see supra*, at 4, could perform the task of evaluating the specific amounts of claims. Moreover, Mr. Dadachanji gives at least three examples where Indian courts have consolidated suits pursuant to their inherent power under Section 151 of the Indian Code of Civil Procedure. In at least one case, such consolidation allegedly occurred without consent of the parties. (Dadachanji Aff. at 9). The absence of a rule for class actions which is identical to the American rule does not lead to the conclusion that India is not an adequate alternative forum.

Final points regarding the asserted inadequacies of Indian procedure involve unavailability of juries or contingent fee arrangements in India. Plaintiffs do not press these arguments, but Mr. Palkhivala touches upon them. They are easily disposed of. The absence of juries in civil cases is a feature of many civil law jurisdictions, and of the United Kingdom. *Piper* at 252, n. 18, 102 S.Ct. at 264, n. 18 and citations therein. Furthermore, contingency fees are not found in most foreign jurisdictions. *Piper* at 252, n. 18, 102 S.Ct. at 264, n. 18. In any event, the lack of contingency fees is not an insurmountable barrier to filing claims in India, as demonstrated by the fact that more than 4,000 suits have been filed by victims of the Bhopal gas leak in India, already. According to Mr. Palkhivala, moreover, well-known lawyers have been known to serve clients without charging any fees. (Palkhivala Aff. at 8).

Plaintiffs' final contention as to the inadequacy of the Indian forum is that a judgment rendered by an Indian court cannot be enforced in the United States without

---

**8.** The Court observes that the alleged problem would appear to act to the detriment of defendant, not plaintiffs. It is Union Carbide which urges that third-party defendants are necessary. (Memo in Support at 27–28). Defendant discounts the supposed unavailability of third-party impleader, while the plaintiffs find its lack objectionable. These postures lead the Court to the conclusion that this argument is not compelling in either direction. The lack of specific third-party practice will not concern the Court if it does not concern Union Carbide.

resort to further extensive litigation. Conversely, plaintiffs assert, Indian law provides *res judicata* effect to foreign judgments, and precludes plaintiffs from bringing a suit on the same cause of action in India. (Galanter Aff. at 63–65). Mr. Dadachanji disputes this description of the Indian law of *res judicata.* He asserts that the pendency, or even final disposition, of an action in a foreign court does not prevent plaintiffs from suing in India upon the original cause of action. Plaintiffs would not be limited, Mr. Dadanchanji argues, to an Indian action to enforce the foreign judgment. (Dadachanji Aff. at 19–20). In addition, he states that an Indian court, before ordering that a foreign judgment be given effect, would seek to establish whether the foreign court had failed to apply Indian law, or misapplied Indian law. (Dadachanji Aff. at 20).

The possibility of non-enforcement of a foreign judgment by courts of either country leads this Court to conclude that the issue must be addressed at this time. Since it is defendant Union Carbide which, perhaps ironically, argues for the sophistication of the Indian legal system in seeking a dismissal on grounds of *forum non conveniens,* and plaintiffs, including the Indian Government, which state a strong preference for the American legal system, it would appear that both parties have indicated a willingness to abide by a judgment of the foreign nation whose forum each seeks to visit. Thus, this Court conditions the grant of a dismissal on *forum non conveniens* grounds on Union Carbide's agreement to be bound by the judgment of its preferred tribunal, located in India, and to satisfy any judgment rendered by the Indian court, and affirmed on appeal in India. Absent such consent to abide by and to "make good" on a foreign judgment, without challenge except for concerns relating to minimal due process, the motion to dismiss now under consideration will not be granted. The preference of both parties to play ball on a distant field will be taken to its limit, with each party being ordered to be bound by the decision of the respective foreign referees.

To sum up the discussion to this point, the Court determines that the Indian legal system provides an adequate alternative forum for the Bhopal litigation. Far from exhibiting a tendency to be so "inadequate or unsatisfactory" as to provide "no remedy at all," the courts of India appear to be well up to the task of handling this case. Any unfavorable change in law for plaintiffs which might be suffered upon transfer to the Indian courts, will, by the rule of *Piper,* not be given "substantial weight." Differences between the two legal systems, even if they inure to plaintiffs' detriment, do not suggest that India is not an adequate alternative forum. As Mr. Palkhivala asserts with some dignity, "[w]hile it is true to say that the Indian system today is different in some respects from the American system, it is wholly untrue to say that it is deficient or inadequate. Difference is not to be equated with deficiency." (Palkhivala Aff. at 4). *Piper* at 254, 102 S.Ct. at 265. The inquiry now turns to a weighing of the public and private interest factors.

### 2. Private Interest Concerns.

The *Gilbert* Court set forth a list of considerations which affect the interests of the specific litigants to an action, and which should be weighed in making a *forum non conveniens* determination. The so-called private interest factors, along with public interest factors discussed below, were not intended to be rigidly applied. As the Court stated in *Piper,*

> "[E]ach case turns on its facts." If central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the flexibility that makes it so valuable.

*Piper* at 249–50, 102 S.Ct. at 263. Recognizing that "[p]articularly with respect to the question of relative ease of access to sources of proof," "the private interests point in both directions," the Supreme Court nevertheless upheld a district court's decision to dismiss a case in favor of the relative convenience of a forum in Scotland. *Piper* at 257, 102 S.Ct. at 267. By contrast, this Court finds that the private in-

terests point strongly one way. As in *Piper*, it appears that the burdensome effect of a trial in this forum supports a finding that the private interest factors in this case weigh strongly in favor of dismissal.

## A. Sources of Proof.

The first example of a private interest consideration discussed in *Gilbert* is "relative ease of access to sources of proof." As stated, the analysis of this issue must hinge on the facts. Limited discovery on the issue of *forum non conveniens* has taken place, pursuant to the Court's order of August 14, 1985.[9] The Court can therefore proceed to discuss this question.

Union Carbide argues that virtually all of the evidence which will be relevant at a trial in this case is located in India. Union Carbide's position is that almost all records relating to liability, and without exception, all records relevant to damages, are to be found in and around Bhopal. On the liability question Union Carbide asserts that the Bhopal plant was managed and operated entirely by Indian nationals, who were employed by UCIL. (Affidavit of Warren J. Woomer, formerly Works Manager of the Bhopal plant ("Woomer Aff.") at 2). Defendant asserts that the Bhopal plant is part of UCIL's Agricultural Products Division, which has been a separate division of UCIL for at least 15 years, and that the plant had "limited contact" with UCIL's Bombay headquarters, and almost no contact with the United States. (Woomer Aff. at 4, 32). Woomer claims to have been the last American employed by UCIL. He departed from Bhopal in 1982. (Woomer Aff. at 2).

Woomer describes the structure and organization of the Bhopal facility at the time of the accident. The plant had seven operating units, each headed by a manager or department head, each an Indian national.[10] The managers or department heads each reported either directly to the plant's General Works Manager, or to one of three Assistant Works Managers. (Woomer Aff. at 6). Each of these is also an Indian national. Three of the operating units which at this very early stage of inquiry into liability appear to have been potentially involved in the MIC leak are the Carbon Monoxide, MIC/Phosgene and Carbamoylation units. (Woomer Aff. at 7–10). The Carbon Monoxide and MIC/Phosgene units together employed 63 employees, all Indian nationals. (Woomer Aff. at 9). The Carbamoylation unit employed 99 Indian nationals. (Woomer Aff. at 10). Mr. Woomer states that an inquiry into the cause of the accident would require interviews with at least those employees who were on duty at the Bhopal facility "immediately prior or after the accident;" Mr. Woomer asserts that there are 193 employees, all Indians, who must be interviewed. (Woomer Aff. at 58).[11]

In addition to the seven operating units, the Bhopal plant contained seven functional departments which serviced operations.[12] The seven heads of the units reported within the plant much as the department heads did.

The maintenance unit was apparently subdivided into departments including Instrumentation, Mechanical Maintenance, both part of the Agricultural Chemical Maintenance unit, which employed 171 people in total, and Plant Engineering and Formulation Maintenance, which employed 46 people. (Woomer Aff. at 11–12). In

9. Discovery was ably managed by Magistrate Michael H. Dolinger, of the Southern District of New York.

10. The seven operating units included Carbon Monoxide, MIC/Phosgene, Carbamoylation, Alpha Naphthol, Aldicarb, Utilities and Formulations.

11. Mr. Woomer states that a post-accident technical team sought to interview these 193 employees. According to Mr. Woomer, the Indian CBI, which had stepped into the plant following the tragedy, advised the technical team that interviews could be conducted only of the General Works Manager and MIC Production Manager, neither of whom was present at the time of the leak. (Woomer Aff. at 57–58).

12. The seven functional units were Maintenance, Quality Control, Stores, Purchasing, Safety/Medical, Industrial Relations and Works Office. (Woomer Aff. at 6).

addition, the Utilities and Electrical department employed 195 people. (Woomer Aff. at 13). According to Mr. Woomer, the various maintenance organizations performed repairs on equipment, provided engineering support, fabricated certain equipment, salvaged other portions, and controlled utilities, temperatures and pressures throughout the plant. (Woomer Aff. at 11–14).

Moreover, according to Mr. Woomer, these UCIL departments also kept daily, weekly and monthly records of plant operations, many of which were purportedly seized by the CBI and selected for copying by CBI immediately after the accident.[13] The records and reports of the various maintenance units would likely be relevant to the question of liability at trial.

Of the additional functional units, it is possible that Quality Control, with 54 employees, Purchasing, with 53, or Stores may have been directly involved in the disaster by virtue of their participation in analyzing plant output, procuring raw materials for the chemical processes of the plant, and maintaining spare parts and certain chemicals. (Woomer Aff. at 14–19). Thus, the records and reports of these three departments may be necessary to an investigation of liability. While examination of members of the Works Office department and Industrial Relations department would likely be less directly useful, information regarding plant budgets and employee histories might be of relevance. Of great importance are the records and reports of the Safety/Medical department, which was responsible for daily auditing of safety performance in all departments, training and testing on safety rules, maintaining safety statistics and planning and implementing safety drills. (Woomer Aff. at 22–23). The 31 Indian employees of this department worked with the Central Safety Committee of the plant, whose members were drawn from plant management, and the Departmental Safety Committees. Operating units were required to monitor plant safety mechanisms weekly, and to keep monthly checklists. (Holman Aff. # 2 at 9). The Central Safety Committee met monthly, as did the Departmental Safety Committees. (Woomer Aff. at 39). The MIC Unit held monthly safety committee meetings, for example, and issued monthly reports. (Woomer Aff. at 41). Quarterly "Measures of Performance" reviews also covered safety issues, and were required of each operating unit. (Woomer Aff. at 40). Certainly, interviews of the plant personnel involved in safety reports and audits would be particularly relevant to the investigation of the disaster.

Plaintiffs refer to three occasions upon which Union Carbide, not UCIL, employees conducted safety audits at the Bhopal plant. As defendant correctly argues, these three events constitute a very small fraction of the thousands of safety audits conducted at the Bhopal facility. The three audits, moreover, were conducted in 1979, the fall of 1980 and in May of 1982, many years prior to the accident which is the subject of this lawsuit. (Plaintiffs' Memo in Opp. at 25).[14]

Two accidents which occurred previously at the Bhopal plant might also be of relevance to the liability inquiry in this litigation. On December 24, 1981, a phosgene gas leak killed a UCIL maintenance work-

---

**13.** Mr. Bud Holman, counsel for Union Carbide, states in his second affidavit that over 36,000 of the 78,000 pages of documents seized by the CBI represent plant operation records. (Holman Aff. # 2 at 5). He asserts that 1,700 pages deal with maintenance work performed in 1983 and 1984. (Holman Aff. # 2 at 8).

**14.** The 1982 "Operational Safety Survey" was apparently fairly extensive. It was conducted by three United States employees of Union Carbide, and led to a report which discussed "major" concerns and possibility of "serious personnel exposure." (Memo in Opp. at 25). Mr. Woomer asserts, and plaintiffs do not refute, that this Survey was not intended to "serve a policing function," but was performed at the specific request of UCIL. In addition, follow-up responsibility "rested exclusively with UCIL plant management." (Woomer Aff. at 37–38).

Moreover, Union Carbide states that the Union of India, itself, conducted similar safety audits and made recommendations. (Affidavit of Ranjit K. Dutta, Business Manager of Union Carbide Agricultural Products Company ("Dutta Aff.") at 58–64).

er. Reports of the fatality were sent to Union Carbide management in the United States. (Woomer Deposition, Exs. 30 and 31). Plaintiffs assert that the accident report called for increased training in Bhopal by United States employees of Union Carbide's Institute, West Virginia, plant. Defendant states that the responsibility for remedying problems in the Bhopal plant rested with the plant itself, and that Union Carbide did not make any recommendations, and was involved only to the extent of receiving a copy of the report which called for its involvement in further training. (Woomer Aff. at 41).

The second accident at Bhopal prior to the disaster of December, 1984 took place on February 9, 1982, when a pump seal, perhaps improperly used, failed. (Memo in Opp. at 24; Woomer Aff. at 41). Many employees were injured, and at least 25 were hospitalized. Plaintiffs discuss the fact that Robert Oldford, president of Union Carbide Agricultural Products Company ("UCAPC") a wholly-owned subsidiary of Union Carbide headquartered in the United States, was in Bhopal at the time of the February 1982 leak. (Memo in Opp. at 24). Union Carbide asserts that Mr. Oldford was visiting UCIL's Research and Development Centre, located several miles from the Bhopal plant for an unrelated purpose, and was only coincidentally in Bhopal when the leak occurred. To the extent that this presence in India in 1982 has any significance, Mr. Oldford, and any other United States employees of Union Carbide who conducted safety audits in Bhopal or were present when accidents occurred there, may be flown to Bhopal for testimony or discovery.

In addition to safety data, two other types of proof may be relevant to a trial of this case on the merits. Information regarding plant design, commissioning and start-up may bear upon the liability question. Information pertinent to employee training should also have significance.

Leaving aside the question of whether the Government of India or UCIL chose the site and product of the Bhopal plant, the Court will evaluate the facts which bear on the issue of relevant records. The findings below concern the location of proof only, and bear solely upon the *forum non conveniens* motion. The Court expressly declines to make findings as to actual liability at this stage of the litigation.

Plaintiffs and defendant agree that in 1973 Union Carbide entered into two agreements with UCIL which were entitled "Design Transfer Agreement" and "Technical Service Agreement." According to plaintiffs, Union Carbide, pursuant to the Design Transfer Agreement, provided a process design to UCIL, the "detailing [of which] was undertaken in India." (Memo in Opp. at 17). The process design package consisted of the basic plan of the factory, which was to be fleshed out in the detailing phase. Plaintiffs state that at least nine Union Carbide technicians travelled to India to monitor the progress of the project. Union Carbide also allegedly assigned a "key engineer," John Couvaras, to serve as UCIL Bhopal project manager. Mr. Couvaras allegedly "assumed responsibility for virtually every aspect of the detailing of the process design," and approved detail reports of "not only UCIL but also independent contractors, including Humphreys & Glasgow Consultants Private Ltd. and Power Gas Limited" of Bombay, India. (Memo in Opp. at 17–20).[15]

Plaintiffs also claim that "[n]o change of any substance was made from Union Carbide's design during the detailing phase." Plaintiffs note that only "one portion" of the process design work provided to UCIL by Union Carbide was not used. (Memo in Opp. at 20). In effect, plaintiffs seek to establish that Union Carbide was the creator of the design used in the Bhopal plant, and directed UCIL's relatively minor detailing program. They urge that for the most

15. Plaintiffs assert that Mr. Couvaras exemplifies Union Carbide's "international employee" whose mobility throughout the Union Carbide affiliates causes "[a]ny notion of discrete corporate identities [to] blur[ ]." (Memo in Opp. at 18–19).

part relevant proof on this point is located in the United States.

Defendant seeks to refute this contention, with notable success. Turning first to the affidavit of Robert C. Brown, who describes himself as "chief negotiator for Union Carbide Corporation in connection with the two agreements it entered into with . . . UCIL in November, 1973," the Court is struck by the assertion that the two agreements were negotiated at "arms-length" pursuant to Union Carbide corporate policy, and that the Union of India mandated that the Government retain "specific control over the terms of any agreements UCIL made with foreign companies such as Union Carbide Corporation." (Brown Aff. at 3–4).[16]

Mr. Brown alleges that the Letter of Intent issued by the Union of India in March 1972, pursuant to which construction and design of the plant were allowed to ensue provided, *inter alia*, that:

(2) [F]oreign collaboration and import of equipment be settled to the satisfaction of the Government.

Mr. Brown claims, on personal information, that UCIL told him that Union Carbide would not be allowed to be involved in the Bhopal project beyond the provision of process design packages. (Brown Aff. at 5). The Design Transfer Agreement indicates that Union Carbide's duty under the Agreement was to provide process design packages, and that UCIL, not Union Carbide, would be responsible to "detail design, erect and commission the plant." (Defendant's Ex. 4, § 4.1). Union Carbide, accordingly, issued limiting warranties with respect to the design packages, detailing of which it would not be involved with. (Brown Aff. at 7, Ex. 4, §§ 4.1, 12.3).

The nature of UCIL's detail design work is discussed in the affidavit of Ranjit K. Dutta, who has held various positions at UCIL and UCAPC. From 1973 through 1976, Mr. Dutta was employed as General Manager of the Agricultural Products Division of UCIL. (Dutta Aff. at 2).

Mr. Dutta asserts that the Bhopal facility was built by UCIL over the eight years from 1972 to 1980. (Dutta Aff. at 8). He asserts that Union Carbide's role in the project was "narrow", and limited to providing "certain process design packages for certain parts of the plant." (Dutta Aff. at 9). He continues, stating:

Once it did that, it had no further design or engineering role,

and that:

[T]he process design packages which Union Carbide Corporation provided are nothing more than summary design starting points. . . . They set forth only the general parameters. . . . A plant cannot be constructed from a process design package. The detail design comprises approximately 80 percent of the sum of the man hours involved in the design of any project and transposes the general process design parameters into an actual design which can be used for purchasing equipment and actual construction.

(Dutta Aff. at 9–12). (emphasis omitted).

According to Mr. Dutta, during the five years between the date upon which Union Carbide submitted process designs, and the date upon which the plant started-up, there were only four visits to Bhopal by Union Carbide process design engineers. (Dutta Aff. at 14). In contrast, he asserts that ten to fifteen UCIL engineers, working primarily out of Bombay, were involved in design detailing. (Dutta Aff. at 16). These UCIL engineers oversaw the 55 to 60 Indian engi-

---

**16.** As support, Mr. Brown points to the Union Carbide Corporate Policy Manual, Section 1.10 which states:

The "arms-length principle" is a central consideration in transfer and pricing of all technology transactions with affiliates.

"Arms length" is defined as:

The principle whereby inter-company transactions between Union Carbide and its affiliates,

or between affiliates, will reflect the cost to unrelated parties of the same or similar technology under similar circumstances.

(Plaintiffs' Exhibit 3). Thus, Mr. Brown argues that Union Carbide related with UCIL much as it would have with an unaffiliated, or even competing company.

neers employed by the Bombay engineering firm which performed the detail design work. This firm, Humphreys and Glasgow, submitted designs and drawings to the UCIL engineers for approval. Corrected drawings were returned by UCIL to Humphreys and Glasgow for changes, and sent back to UCIL for final approval. (Dutta Aff. at 19–24).[17] Mr. Dutta alleges that "at no time were Union Carbide Corporation engineering personnel from the United States involved in approving the detail design or drawings prepared upon which construction was based. Nor did they receive notices of changes made." (Dutta Aff. at 24).

Mr. Dutta expressly states that the MIC storage tank and monitoring instrumentation were fabricated or supplied by two named Indian sub-contractors. The vent gas scrubber is alleged to have been fabricated in the Bhopal plant shop. (Dutta Aff. at 25).

Of the 12,000 pages of documents purportedly seized by the CBI regarding design and construction of the Bhopal plant, an asserted 2,000 are design reports of Humphreys and Glasgow, UCIL or other contractors. Defendant claims that blueprints and calculations comprise another 1,700 pages of documents held by the CBI. Five thousand pages of contractors' files, including specifications and contracts are asserted to be in India. In addition, Union Carbide claims that blueprints and diagrams may not reflect final design changes as incorporated into the actual plant, and that the detail design engineers' testimony will be needed to determine the configuration of the actual plant.[18] (Holman Aff. # 2 at 15–16).

One final point bearing on the information regarding liability is contained in the affidavit of Edward Munoz, at a relevant time the General Manager of UCIL's Agricultural Products Division. He later acted as Managing Director of UCIL. Mr. Munoz has submitted an affidavit in which he states that Union Carbide decided to store MIC in large quantities at the Bhopal plant, despite Mr. Munoz' warnings that MIC should be stored only in small amounts because of safety. (Memo in Opp. at 15–16; Munoz Aff.). Mr. Dutta, for defendant, asserts that there was never any issue of token storage of MIC at Bhopal, as Mr. Munoz states, and that there is no truth to Mr. Munoz' assertion that he was involved in the storage issue. (Dutta Aff. at 30).[19]

---

**17.** Humphreys and Glasgow was allegedly responsible for the following:

Among other things, developing final equipment and unit layouts and plot plans, including equipment layout drawings, detailed piping arrangement drawings, layout of electrical equipment; the steel structure, including detail design and working drawings for the buildings and foundation; mechanical equipment design including specification of all proprietary and fabricated equipment; review and certification of vendor's drawings and documents, preparation of orthographic piping drawings for all portions of the plant, preparation of isometric piping drawings, preparation of preliminary and final bills of materials for pipes, valves, gaskets, instrument associated hardware, electrical conduit; electrical engineering work, instrument engineering, including drawings on instrument hook ups, lists of instruments, review of instrument specification and data sheets; definition of material and make calculation to size insulation, preparation of insulation lists, preparation of material take off and inquiry specification packages, procurement assistance including assisting in evaluation of bids and selection of vendors, inspection of certain equipment and materials to ensure proper workmanship and compliance with specifications and codes, and coordinating where Indian law required inspection or certification by governmental inspections; preparation of a project schedule, project reports and costs control reports at least once per month, construction supervision including supervision of mechanical testing of installed equipment, assistance in commissioning.

(Dutta Aff. at 19–20).

**18.** Mr. Couvaras, whom plaintiffs assert was a "key engineer" for the project, and enjoyed mobility between Union Carbide and UCIL, is described by Mr. Dutta as primarily a UCIL employee. The "international employee" status he carried is explained as a pension accounting mechanism. (Dutta Aff. at 27).

**19.** Mr. Dutta asserts that Mr. Munoz was a paid consultant to a member of Plaintiffs' Executive Committee at the time the affidavit was made. No documentary proof of this assertion has been submitted. (Dutta Aff. at 31; Holman Aff. # 2 at 18). Moreover, two affidavits submitted

The Court cannot make any determination as to the conflicting affidavits before it. This question, which involves credibility concerns, is left for later in the litigation. To the extent that this particular matter bears upon the relative ease of access to sources of proof, Mr. Munoz and Mr. Dutta both may be called to testify at trial or discovery. Mr. Dutta's home is in Bhopal. (Dutta Aff. at 1). The Court is not aware of the whereabouts of Mr. Munoz at this time. Either of the two could travel to either alternative forum.

In addition to design and safety records, material regarding training of Bhopal personnel is likely to be relevant to the question of liability. Plaintiffs state that Warren Woomer supervised the training of UCIL personnel at Union Carbide's Institute, West Virginia plant. According to plaintiffs, 40 UCIL employees were transported to Institute's MIC facility for lengthy training. (Memo in Opp. at 22). Mr. Woomer states in reply that the 40 employees thus trained represented a fraction of the over 1,000 employees who were trained exclusively in Bhopal. (Woomer Aff. at 43). In addition, Mr. Woomer asserts that the training at Institute was pursuant to an arms-length agreement, that UCIL selected the parties to be trained, and that UCIL paid Union Carbide for the training. (Woomer Aff. at 43). Moreover, Mr. Woomer's description of the training provided at Bhopal suggests that each of the plant's employees had lengthy cumulative training, of which the Institute training was but a very small portion. (Woomer Aff. at 46). Personnel records, in any event, are located in Bhopal. (Holman Aff. # 2 at 4).

The briefs and affidavits contain considerable discussion on the matter of commis-

sioning and start-up of the Bhopal plant. The Court need not resolve the question of who was responsible for these aspects of plant operation. However, the Court determines that the manual regarding start-up was prepared by Indian nationals employed by UCIL. (Woomer Aff. at 48).

In the aggregate, it appears to the Court that most of the documentary evidence concerning design, training, safety and start-up, in other words, matters bearing on liability, is to be found in India. Much of the material may be held by the Indian CBI. Material located in this country, such as process design packages and training records of the 40 UCIL employees trained at Institute, constitutes a smaller portion of the bulk of the pertinent data than that found in India. Moreover, while records in this country are in English, a language understood in the courts of India, certain of the records in India are in Hindi or other Indian languages, as well as in English. (Holman Aff. # 2 at 12). The Indian language documents would have to be translated to be of use in the United States. The reverse is not true. It is evident to the Court that records concerning the design, manufacture and operation of the Bhopal plant are relatively more accessible in India than in the United States, and that fewer translation problems would face an Indian court than an American court. Since Union Carbide has been directed to submit to discovery in India pursuant to the liberal grant of the American Federal Rules of Civil Procedure, and this opinion is conditioned upon such submission, any records sought by plaintiffs must be made available to them in India. The private interest factor of relative ease of access to sources of proof bearing on liability favors dismissal of the consolidated case.[20] The Indian

on behalf of defendant state that Mr. Munoz was removed from his position as Union Carbide Corporation Division President in 1978, and is "extremely bitter as a result of the removal." (Dutta Aff. at 31; Holman Aff. # 2 at 18).

**20.** Union Carbide asserts throughout its briefs and affidavits that evidence relevant to the question of damages is located in India, as well. Certainly the victims themselves, and, for the

most part, their medical records, are found in or near Bhopal. However, as plaintiffs argue, a "head count" of witnesses is not dispositive of a *forum non conveniens* motion. (Memo in Opp. at 74–79). Not all of the victims would need to be transported to the United States to describe their injuries. The Bhopal "scheme" provides a mechanism for evaluating each individual's claim. Only representative plaintiffs need testi-

Government is asserted to have been involved in safety, licensing and other matters relating to liability. Records relating thereto are located in India, as are the records seized by the CBI. Although plaintiffs state that all such records could and would be made available to this Court, it would be easier to review them in India. Transmittal and translation problems would thereby be avoided.

### B. Access to Witnesses.

*Gilbert* teaches a second important consideration under the heading of private interests, the "availability of compulsory process for attendance of willing, and the cost of obtaining attendance of unwilling, witnesses." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. As discussed in detail above, most witnesses whose testimony would relate to questions of causation and liability are in India. Engineers from UCIL and Humphreys and Glasgow and other subcontractors, of whom there are hundreds, are located in India. Shift employees from the possibly malfunctioning units, safety monitoring personnel, those responsible for training, safety auditing, procurement, compliance with regulations and other operations might be required to testify. More than likely, many of these potential witnesses do not speak English, and would require translators. Many of the witnesses are not parties to this litigation. Therefore, as the Court of Appeals for the Second Circuit has stated in the context of a *forum non conveniens* motion:

> In fact, the plaintiffs' cases on liability will depend in large measure upon the knowledge and activities of such witnesses as the employees of [companies] who are not parties to this litigation, but who directly participated in the events which gave rise to it. The United States District Court in New York, however, has no power to subpoena any of these witness-

es. It is unlikely that many would be willing to travel to New York to testify; and the cost, in any event, would be prohibitively great.

*Fitzgerald v. Texaco*, 521 F.2d 448, 451–52 (2d Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976) (footnote omitted). In contrast, the relatively few witnesses who reside in the United States are primarily employed by Union Carbide. As employees of a party they would probably be subject to the subpoena power of Indian courts. Transportation costs would also be lower, since fewer people would have to make the journey to testify.

The presence of the Indian Government in this action is also of critical importance on this motion. Plaintiffs assert that "all necessary officials and employees of the Central Government will voluntarily comply with requests to attend trial." (Memo in Opp. at 70; Answer to No. 124 of Defendant's First Requests for Admission, Exhibit 55). This statement does not provide for attendance by officials of Madhya Pradesh or the Bhopal municipality, whom Union Carbide indicates might be impleaded as third-party defendants. As witnesses only, these officials would not be subject to this Court's subpoena power. As third-party defendants, they might be immune from suit in the United States by the terms of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* State and city officials might also lack sufficient contacts with this district to allow this Court to exercise personal jurisdiction over them.

While Union Carbide might be deprived of testimony of witnesses or even potential third-parties if this action were to proceed in this forum, no such problem would exist if litigation went forward in India.

The unavailability of compulsory process for Indian non-party witnesses, of whom

---

fy as to damages. This Court would not countenance the impractical and time-consuming process of calling each of the approximately 200,000 victims at a trial in this country. Evidence on damages, as well as liability, is found in India, but not to the overwhelming extent contended by defendant. Moreover, the Court

is concerned with the policy effect of allowing the number of foreign victims to affect directly the *forum non conveniens* determination. If carried to the extreme, this "head count" doctrine would mean that the more people hurt, the less likely a suit in this country would be.

there are many, such as would ensure their presence at a trial in this country, the high cost of transporting the large number of Indian nationals to the United States, as well as the need to translate their testimony should they appear, all support the argument favoring dismissal of this action on *forum non conveniens* grounds. The private interest concerns regarding witnesses emphasize the logic of defendant's position. Relatively fewer witnesses reside in the United States than in India. Almost all of the witnesses located in this country are employees of defendant, and would be subject to compulsory process in India as a result. Transportation costs for the relative few would not compare to the alternate costs of transporting hundreds of Indian witnesses. Since English is widely spoken in India, less translation would be required for foreign witnesses in India than in the converse situation. Should this case be tried in India, fewer obstacles to calling state and local officials as witnesses or parties would face the defendant. The Court determines that this private interest factor weighs in favor of dismissal.

### C. Possibility of View.

The third private interest factor articulated in *Gilbert* is the ease of arranging for a view of the premises around which the litigation centers. Plaintiffs assert that the notion that a jury view of the plant and environs is necessary is "simply preposterous." (Memo in Opp. at 71). Plaintiffs note that a viewing of the premises is rarely conducted in products liability cases, since videotapes, pictures, diagrams, schematics and models are more instructive than an actual view. (Memo in Opp. at 71). A viewing of the plant and hutments would probably not be of utmost importance in determining liability, and this consideration is not afforded great weight on this motion.

However, the instant case is not identical to the product design defect case cited by plaintiffs, in which a district court judge determined that "the present appearance of the defendants' facilities may or may not be relevant to production which occurred" in the period in which the allegedly viola-

tive manufacture occurred. *Hodson v. A.H. Robins Co., Inc.*, 528 F.Supp. 809, 822 (E.D.Va.1981), *aff'd*, 715 F.2d 142 (4th Cir. 1983). In the instant case, the site of the accident was sealed after the leak, and the present condition of the plant might be relevant to a finding of liability. A viewing may not be necessary, but conceivably could be called for later in the litigation. An Indian court is in a far better position than this Court to direct and supervise such a viewing should one ever be required. This consideration, though minor, also weighs in favor of dismissal.

In summary, then, the private interest factors weigh greatly in favor of dismissal on grounds of *forum non conveniens*. Since the "balance is strongly in favor of the defendant" and foreign plaintiffs' choice of a foreign forum is given less than maximum deference, the Court determines that dismissal is favored at this point in the inquiry. *Gilbert* 330 U.S. at 508, 67 S.Ct. at 843.

### 3. Public Interest Concerns.

The *Gilbert* Court articulated certain factors which affected the interests of non-parties to a litigation to be considered in the context of the doctrine of *forum non conveniens*. These public interest concerns were held to be relevant to a court's determination of whether to dismiss on these grounds. The Supreme Court expressly identified a few factors:

Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than

having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Gilbert* at 508–09, 67 S.Ct. at 843. The Court will consider these various factors in turn, as well as others discussed by the parties and *amicus curiae.*

### A. Administrative Difficulties.

As is evident from the discussion thus far, the mere size of the Bhopal case, with its multitude of witnesses and documents to be transported and translated, obviously creates administrative problems.

There can be no doubt that the Bhopal litigation will take its toll on any court which sits in judgment on it. This Court sits in one of the busiest districts in the country, and finds, as a matter within its experience, that this is a "congested center" of litigation as described in *Gilbert* at 508. The burden which would be imposed should litigation continue here was aptly described by the Court of Appeals for the Second Circuit in *Schertenlieb v. Traum,* 589 F.2d 1156 (2d Cir.1978). Reviewing a district judge's ruling for dismissal on the grounds of *forum non conveniens,* the Second Circuit observed that "were it not for the somewhat unusual fact that it is the forum resident who seeks dismissal, we would have to say very little regarding the exercise of Judge Metzner's discretion in dismissing this case." *Schertenlieb* at 1164. In affirming the ruling for dismissal, the Court of Appeals asked the rhetorical question:

If litigation is in a clearly inconvenient forum, why should defendant and the court be burdened with its continuing there, if an alternative forum now exists so that plaintiff will not be without a remedy?

*Schertenlieb* at 1163.

This Court has already determined that because of the location of the preponderance of the evidence in India, and the difficulty of transporting documents and witnesses to this forum, this district is clearly an inconvenient forum for the litigation. An alternative forum is seen to exist in India. This Court feels that the answer to the *Schertenlieb* question is clear.

A district judge in this district, in *Domingo v. States Marine Lines,* 340 F.Supp. 811 (S.D.N.Y.1972) evaluated the administrative concerns of the Southern District of New York, relevant to this Court today, a full fourteen years later. The *Domingo* court stated:

It is scarcely necessary to dwell on the fact that this Court is the most heavily burdened Federal District Court in the country. The Civil Calendar grows more congested all the time. The priority now properly given to the disposition of criminal cases tends to increase this congestion.

\*　　\*　　\*　　\*　　\*　　\*

I see no reason why this Court, with its heavy burdens and responsibilities, should be burdened with cases like these which, from every point of view, should be tried in the courts of the nation where all the relevant events occurred and whose citizens are primarily involved. Certainly, this district and the Metropolitan area in which it is situated have no conceivable relation to this litigation except for the fact that the defendant happens to be doing business here.

*Domingo* at 816.

The defendant in this case, involved as it appears to have been in the process design phase of the plant's construction, may have a slightly less tenuous connection to this forum than a corporation which is merely doing business here. Certain business conducted in New York, or in corporate headquarters in Danbury, Connecticut, may have been directly related to development or operation of the UCIL facility in Bhopal. However, almost "all the relevant events" leading to and following from the accident occurred in India. Indian citizens are primarily involved in the case, both as witnesses and claimants. The substantial administrative weight of this case should be centered on a court with the most significant contacts with the event. Thus, a court in Bhopal, rather than New York, should bear the load.

In addition to the burden on the court system, continuation of this litigation in this forum would tax the time and resources of citizens directly. Trial in this case will no doubt be lengthy. An assigned jury would be compelled to sit for many months of proof. Because of the large number of Indian language-speaking witnesses, the jurors would be required to endure continual translations which would double the length of trial. The burden on the jurors themselves, and on their families, employers and communities would be considerable. The need for translation would be avoided if trial were to be held in Bhopal.

Clearly, the administrative costs of this litigation are astounding and significant. Despite its deep concern for the victims of the tragedy, this Court is persuaded by a recent relevant decision of the New York State Court of Appeals. In the opinion in *Islamic Republic of Iran v. Pahlavi*, 62 N.Y.2d 474, 478 N.Y.S.2d 597, 467 N.E.2d 245 (1984), *cert. denied*, — U.S. —, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985), with reference to a decision discussing actions brought in New York by the Iranian Government against the Shah and his wife, the Court of Appeals stated that:

> [T]he taxpayers of this State should not be compelled to assume the heavy financial burden attributable to the cost of administering the litigation contemplated when their interest in the suit and the connection of its subject matter . . . is so ephemeral.

*Islamic Republic* at 483, 478 N.Y.S.2d 597, 467 N.E.2d 245 (citations omitted). Administrative concerns weigh against retention of this case.

### B. The Interests of India and the United States.

Plaintiffs, and especially *amicus curiae* emphasize this point of argument in opposition to the motion to dismiss. Concerned with the asserted possibility of developing a "double-standard" of liability for multinational corporations, plaintiffs urge that American courts should administer justice to the victims of the Bhopal disaster as they would to potential American victims of industrial accidents. The public interest is served, plaintiffs and *amicus* argue, when United States corporations assume responsibility for accidents occurring on foreign soil. "To abandon that responsibility," *amicus* asserts, "would both injure our standing in the world community and betray the spirit of fairness inherent in the American character." (*Amicus* Brief at 4). The specific American interests allegedly to be served by this Court's retention of the case include the opportunity of creating precedent which will "bind all American multinationals henceforward," (*Amicus* Brief at 20); promotion of "international cooperation," (*Amicus* Brief at 22–23); avoidance of an asserted "double standard" of liability, and the prevention of "economic blackmail of hazardous industries which would extract concessions on health and environmental standards as the price of continuing operations in the United States." (*Amicus* Brief at 20). An additional American public interest ostensibly to be served by retention of the litigation in this forum is advanced by plaintiffs themselves. They assert that the deterrent effect of this case can be distinguished from the situation in *Piper*, where the Court rejected the argument that "American citizens have an interest in ensuring that American manufacturers are deterred from producing defective products, and that additional deterrence might be obtained if Piper and [its co-defendant] were tried in the United States, where they could be sued on the basis of both negligence and strict liability." *Piper* 454 U.S. at 260, 102 S.Ct. at 268. The Court stated that:

> [T]he incremental deterrence that would be gained if this trial were held in an American court is likely to be insignificant. The American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here.

*Piper* at 260–61, 102 S.Ct. at 268. According to plaintiffs, the potential for greater deterrence in this case is "self-evident."

The opposing interest of India is argued to be ill-served by sending this litigation to India. Pointing to the fact that the Union of India chose this forum, plaintiffs state that there can be "no question as to the public interest of India." (Memo in Opp. at 91). Union Carbide's statements regarding the interests of India in this litigation are summarily dismissed by the plaintiffs, who state that "Union Carbide, whose actions caused the suffering of an entire city, has no standing to assert this belated concern for the welfare of the Indian populace." (Memo in Opp. at 91).

Union Carbide, not surprisingly, argues that the public interest of the United States in this litigation is very slight, and that India's interest is great. In the main, the Court agrees with the defendant.

As noted, Robert C. Brown states in his affidavit on behalf of Union Carbide that the Indian Government preserved the right to approve foreign collaboration and import of equipment to be used in connection with the plant. See supra at 856. In addition, Mr. Brown quoted excerpts from the 1972 Letter of Intent entered into by the Union of India and UCIL, one term of which required that "the purchase of only such design and consultancy services from abroad as are not available within the country" would be allowed. (Brown Aff. at 6). Ranjit K. Dutta states that the Indian Government, in a process of "Indianization," restricted the amount of foreign materials and foreign consultants' time which could be contributed to the project, and mandated the use of Indian materials and experts whenever possible. (Dutta Aff. at 35). In an alleged ongoing attempt to minimize foreign exchange losses through imports, the Union of India insisted on approving equipment to be purchased abroad, through the mechanism of a "capital goods license." (Dutta Aff. at 48–50).

The Indian Government, through its Ministry of Petroleum and Chemicals, allegedly required information from UCIL regarding all aspects of the Bhopal facility during construction in 1972 and 1973, including "information on toxicity" of chemicals. (Dutta Aff. at 44). The Ministry required progress reports throughout the course of the construction project. These reports were required by the Secretariat for Industrial Approvals, the Director General of Technical Development and the Director of Industries of Madhya Pradesh. (Dutta Aff. at 45). Moreover, UCIL was ultimately required to obtain numerous licenses during development, construction and operation of the facility. (Dutta Aff. at 46). The list of licenses obtained fills five pages.[21]

The Indian Government regulated the Bhopal plant indirectly under a series of environmental laws, enforced by numerous agencies, much as the Occupational Safety and Health Administration, the Environmental Protection Agency and state and local agencies regulate the chemical industry in the United States. (Dutta Aff. at 53–56). Emissions from the facility were monitored by a state water pollution board, for example. (Dutta Aff. at 64). In addition, state officials periodically inspected the fully-constructed plant.[22] (Dutta Aff. at 56). A detailed inquiry into the plant's operations was conducted by the Indian Government in the aftermath of the December, 1981 fatality at the MIC unit and the February, 1982 incident involving a pump seal. (Dutta Aff. at 58–62). Numerous federal, state and local commissions, obviously, investigated the most tragic incident of all, the MIC leak of December, 1984.

The recital above demonstrates the immense interest of various Indian governmental agencies in the creation, operation,

---

21. Indian federal and municipal officials also allegedly conducted on-site inspections resulting in approvals for portions of the construction, including approvals for the flare tower, MIC layout and storage, unit refrigeration and MIC/Phosgene structure. (Dutta Aff. at 46–47; Exs. 102–104).

22. One such regular inspection appears to have taken place approximately two weeks before the MIC disaster. (Dutta Aff. at 56; Ex. 116).

licensing and regulation, and investigation of the plant. Thus, regardless of the extent of Union Carbide's own involvement in the UCIL plant in Bhopal, or even of its asserted "control" over the plant, the facility was within the sphere of regulation of Indian laws and agencies, at all levels. The comments of the Court of Appeals for the Sixth Circuit with respect to its decision to dismiss a products liability action on *forum non conveniens* grounds seem particularly apposite. In *In re Richardson-Merrell, Inc.*, 545 F.Supp. 1130 (S.D.Ohio 1982), *modified sub. nom. Dowling v. Richardson-Merrell Inc.*, 727 F.2d 608 (6th Cir.1984), the court reviewed a dismissal involving an action brought by a number of plaintiffs, all of whom were citizens of Great Britain.[23] Defendant in the action was a drug company which had developed and tested a drug in the United States which was manufactured and marketed in England. The suit was brought against the American parent, not the British subsidiary, for injuries allegedly resulting from ingestion of the offending drug in England and Scotland. The district court, in dismissing the case, stated that:

> This action involves the safety of drugs manufactured in the United Kingdom and sold to its citizens pursuant to licenses issued by that government. The interest of the United Kingdom is overwhelmingly apparent. New York, and Ohio [the United States forums] for that matter, have a minimal interest in the safety of products which are manufactured, regulated and sold abroad by foreign entities, even though development or testing occurred in this country.

*In re Richardson-Merrell, Inc.*, 545 F.Supp. at 1135 (footnote omitted). The Sixth Circuit confirmed this view of the public interests, stating:

The interest of the United Kingdom in this litigation is great. The drug was manufactured under a British license by British companies and was marketed and prescribed in the United Kingdom. The alleged injuries took place in England and Scotland and the plaintiffs are citizens and residents of those countries. When a regulated industry, such as pharmaceuticals in this case and passenger aircraft operations in *Piper Aircraft*, is involved, the country where the injury occurs has a particularly strong interest in product liability litigation.... Though no single factor should be determinative in ruling on a *forum non conveniens* motion, the nature of the product and its status as regulated or not must be considered.

*Dowling*, 727 F.2d at 616.

The Indian government, which regulated the Bhopal facility, has an extensive and deep interest in ensuring that its standards for safety are complied with. As regulators, the Indian government and individual citizens even have an interest in knowing whether extant regulations are adequate. This Court, sitting in a foreign country, has considered the extent of regulation by Indian agencies of the Bhopal plant. It finds that this is not the appropriate tribunal to determine whether the Indian regulations were breached, or whether the laws themselves were sufficient to protect Indian citizens from harm. It would be sadly paternalistic, if not misguided, of this Court to attempt to evaluate the regulations and standards imposed in a foreign country. As another district court stated in the context of a drug product liability action brought by foreign plaintiffs in this country,

> plaintiffs where an examination of the *Gilbert* factors demonstrated that the action is more appropriately brought in a foreign forum.... [T]he presence of a handful of American plaintiffs does not preclude such dismissal." *Nai-Chao v. Boeing Co.*, 555 F.Supp. 9, 21 (N.D.Cal. 1982), *aff'd sub. nom., Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir.1983).

**23.** Only a small number of plaintiffs in the Bhopal litigation are United States citizens. Of the 200,000 plaintiffs, approximately nine are American. They have filed the complaints numbered 85 Civ. 0447, 85 Civ. 1096 and 85 Civ. 2098. This is of relative insignificance on this motion to dismiss. "The federal courts have not felt constrained to retain jurisdiction over predominantly foreign cases involving American

Each government must weigh the merits of permitting the drug's use.... Each makes its own determination as to the standards of degree of safety and duty of care.... This balancing of the over-all benefits to be derived from a product's use with the risk of harm associated with that use is peculiarly suited to a forum of the country in which the product is to be used.... The United States should not impose its own view of the safety, warning, and duty of care required of drugs sold in the United States upon a foreign country when those same drugs are sold in that country.

*Harrison v. Wyeth Laboratories*, 510 F.Supp. 1, 4 (E.D.Pa.1980), *aff'd mem.*, 676 F.2d 685 (3d Cir.1982). India no doubt evaluated its need for a pesticide plant against the risks inherent in such development. Its conclusions regarding "[q]uestions as to the safety of [products] marketed" or manufactured in India were "properly the concern of that country." *Harrison* at 4 (emphasis omitted). This is particularly true where, as here, the interests of the regulators were possibly drastically different from concerns of American regulators. The Court is well aware of the moral danger of creating the "double-standard" feared by plaintiffs and *amicus curiae*. However, when an industry is as regulated as the chemical industry is in India, the failure to acknowledge inherent differences in the aims and concerns of Indian, as compared to American citizens would be naive, and unfair to defendant. The district court in *Harrison* considered the hypothetical instance in which a products liability action arising out of an Indian accident would be brought in the United States. The court speculated as follows:

The impropriety of [applying American standards of product safety and care] would be even more clearly seen if the foreign country involved was, for example, India, a country with a vastly differ-

ent standard of living, wealth, resources, level of health care and services, values, morals and beliefs than our own. Most significantly, our two societies must deal with entirely different and highly complex problems of population growth and control. Faced with different needs, problems and resources in our example India may, in balancing the pros and cons ... give different weight to various factors than would our society.... Should we impose our standards upon them in spite of such differences? We think not.

*Harrison* at 4–5. This Court, too, thinks that it should avoid imposing characteristically American values on Indian concerns.

The Indian interest in creating standards of care, enforcing them or even extending them, and of protecting its citizens from ill-use is significantly stronger than the local interest in deterring multinationals from exporting allegedly dangerous technology. The supposed "blackmail" effect of dismissal by which plaintiffs are troubled is not a significant interest of the American population, either. Surely, there will be no relaxing of regulatory standards by the responsible legislators of the United States as a response to lower standards abroad.[24] Other concerns than bald fear of potential liability, such as convenience or tax benefits, bear on decisions regarding where to locate a plant. Moreover, the purported public interest of seizing this chance to create new law is no real interest at all. This Court would exceed its authority were it to rule otherwise when restraint was in order.

The Court concludes that the public interest of India in this litigation far outweighs the public interest of the United States. This litigation offers a developing nation the opportunity to vindicate the suffering of its own people within the framework of

---

**24.** In any event, plaintiffs' "deterrence" and "blackmail" arguments presuppose that Union Carbide would be held more accountable by an American than by an Indian tribunal. Certainly, there is a real possibility of a substantial Indian judgment against defendant, which would serve an identical deterrent function, and prevent a rush of multinationals to foreign locations.

a legitimate legal system. This interest is of paramount importance.[25]

## C. The Applicable Law.

*Gilbert* and *Piper* explicitly acknowledge that the need of an American court to apply foreign law is an appropriate concern on a *forum non conveniens* motion, and can in fact point toward dismissal. *Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843; *Piper*, 454 U.S. at 260, 102 S.Ct. at 268. Especially when, as here, all other factors favor dismissal, the need to apply foreign law is a significant consideration on this type of motion. *Piper* at 260, n. 29, 102 S.Ct. at 268, n. 29. A federal court is bound to apply the choice of law rules of the state in which an action was originally brought; even upon transfer to a different district, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964). Thus, this Court, sitting over a multidistrict litigation, must apply the various choice of law rules of the states in which the actions now consolidated before it were brought.[26] Rather than undertake the task of evaluating the choice of law rules of each state separately, the Court will treat the choice of law doctrine *in toto*. The "governmental interest" analysis, employed by many jurisdictions, requires a court to look to the question of which state has the most compelling interest in the outcome of the case. India's interest in the outcome of the litigation exceeds America's, *see supra* at 44–58. The *lex loci delicti* analysis used in other jurisdictions indicates that the law of the state where the tort occurred should be applied. The place in which the tort occurred was, to a very great extent, India. Other states apply the "most significant relationship" test, or "weight of contacts" test, which evaluate in which state most of the events constituting the tort occurred. The contacts with India with respect to all phases of plant construction, operation, malfunction and subsequent injuries are greater in number than those with the United States. Thus, under any one of these three doctrines, it is likely that Indian law will emerge as the operative law. An Indian court, therefore, would be better able to apply the controlling law than would this United States Court, or a jury working with it. This public interest factor also weighs in favor of dismissal on the grounds of *forum non conveniens*.

## CONCLUSION

■ It is difficult to imagine how a greater tragedy could occur to a peacetime population than the deadly gas leak in Bhopal on the night of December 2–3, 1984. The survivors of the dead victims, the injured and others who suffered, or may in the future suffer due to the disaster, are entitled to compensation. This Court is firmly convinced that the Indian legal system is in a far better position than the American courts to determine the cause of the tragic event and thereby fix liability. Further, the Indian courts have greater access to all the information needed to arrive at the amount of the compensation to be awarded the victims.

The presence in India of the overwhelming majority of the witnesses and evidence, both documentary and real, would by itself suggest that India is the most convenient forum for this consolidated case. The additional presence in India of all but the less than handful of claimants underscores the convenience of holding trial in India. All of the private interest factors described in *Piper* and *Gilbert* weigh heavily toward

---

**25.** While the accident is more than a "local controversy," given the interests of the Indian populace, it is certainly a national controversy which should be "decided at home." *Gilbert* at 508–09. No doubt Indian citizens, many of whom barely are acquainted with their American lawyers, will find the case more accessible if it is tried "in their view" in India.

**26.** Upon a cursory review of the individual complaints comprising this action, the Court notes that suits were brought in California, Connecticut, the District of Columbia, Florida, Illinois, Louisiana, Maryland, New Jersey, New York, Pennsylvania, Tennessee, Texas and West Virginia, at a minimum.

dismissal of this case on the grounds of *forum non conveniens.*

The public interest factors set forth in *Piper* and *Gilbert* also favor dismissal. The administrative burden of this immense litigation would unfairly tax this or any American tribunal. The cost to American taxpayers of supporting the litigation in the United States would be excessive. When another, adequate and more convenient forum so clearly exists, there is no reason to press the United States judiciary to the limits of its capacity. No American interest in the outcome of this litigation outweighs the interest of India in applying Indian law and Indian values to the task of resolving this case.

The Bhopal plant was regulated by Indian agencies. The Union of India has a very strong interest in the aftermath of the accident which affected its citizens on its own soil. Perhaps Indian regulations were ignored or contravened. India may wish to determine whether the regulations imposed on the chemical industry within its boundaries were sufficiently stringent. The Indian interests far outweigh the interests of citizens of the United States in the litigation.

Plaintiffs, including the Union of India, have argued that the courts of India are not up to the task of conducting the Bhopal litigation. They assert that the Indian judiciary has yet to reach full maturity due to the restraints placed upon it by British colonial rulers who shaped the Indian legal system to meet their own ends. Plaintiffs allege that the Indian justice system has not yet cast off the burden of colonialism to meet the emerging needs of a democratic people.

The Court thus finds itself faced with a paradox. In the Court's view, to retain the litigation in this forum, as plaintiffs request, would be yet another example of imperialism, another situation in which an established sovereign inflicted its rules, its standards and values on a developing nation. This Court declines to play such a role. The Union of India is a world power in 1986, and its courts have the proven capacity to mete out fair and equal justice. To deprive the Indian judiciary of this opportunity to stand tall before the world and to pass judgment on behalf of its own people would be to revive a history of subservience and subjugation from which India has emerged. India and its people can and must vindicate their claims before the independent and legitimate judiciary created there since the Independence of 1947.

This Court defers to the adequacy and ability of the courts of India. Their interest in the sad events of December 2–3, 1984 at the UCIL plant in the City of Bhopal, State of Madhya Pradesh, Union of India, is not subject to question or challenge. The availability of the probative, relevant, material and necessary evidence to Indian courts is obvious and has been demonstrated in this opinion.

Therefore, the consolidated case is dismissed on the grounds of *forum non conveniens* under the following conditions:

1. Union Carbide shall consent to submit to the jurisdiction of the courts of India, and shall continue to waive defenses based upon the statute of limitations;

2. Union Carbide shall agree to satisfy any judgment rendered against it by an Indian court, and if applicable, upheld by an appellate court in that country, where such judgment and affirmance comport with the minimal requirements of due process;

3. Union Carbide shall be subject to discovery under the model of the United States Federal Rules of Civil Procedure after appropriate demand by plaintiffs.

SO ORDERED.